UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
RICHARD C. MCKENZIE, JR. et al.,

                Plaintiffs,

       -v-                                 No.  12CV7297-LTS-KNF

ROBERT FISHKO et al.,

                Defendants.
--------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

      In this action, Plaintiffs Richard C. McKenzie, Jr. ("McKenzie"), and Seven

Bridges Foundation, Inc. ("Seven Bridges"), sue Defendants Robert Fishko ("R. Fishko"),

Cheryl Fishko ("C. Fishko") and Forum Gallery, Inc. ("Forum" and collectively, "Defendants"),

asserting claims of breach of contract, fraud, breach of fiduciary duty and unfair and deceptive

trade practices in violation of New York General Business Law § 349.  Plaintiffs seek an

accounting, declaration of a constructive trust, and punitive damages.  Defendants counterclaim,

alleging that this action violates a prior settlement agreement and general release between the

parties.  Plaintiffs' claims are based on Defendants' alleged violation of two agreements between

the parties and misrepresentation of the discounts that Defendants claimed to be providing to

Plaintiffs in connection with the sale of artwork.  The Court has jurisdiction of this action

pursuant to 28 U.S.C. § 1332.

      The parties have each moved for summary judgment and the case has been stayed

pending the resolution of these motions.  The Court has considered carefully all of the parties'

submissions and arguments.  For the following reasons, the Court grants Defendants' motion for

summary judgment with respect to Plaintiffs' claims and denies it with respect to Defendants'

counterclaims.  The Court denies Plaintiffs' cross-motion for summary judgment in its entirety.

<u>BACKGROUND</u>

The following facts are undisputed unless otherwise indicated.  Only the facts and allegations most relevant to the instant motions are recited.[1]  The Court assumes the parties' familiarity with the voluminous record.

McKenzie and Seven Bridges have amassed an art collection worth approximately $200 million, which McKenzie houses in a private museum on his property in Greenwich, Connecticut.  (Def. 56.1 St. ¶¶ 2, 5-8.; Pl. 56.1 Counterstmt. ¶¶ 5-8.)  Forum is an art gallery, run by the Fishkos, that has represented artists for more than fifty years.  (Def. 56.1 St. ¶ 1.)  McKenzie became a customer of Forum in 1997 and, approximately two years later, Seven Bridges also became a customer.  (Def. 56.1 St. ¶ 21.)  Although the parties do not agree as to whether McKenzie purchased particular pieces for his private collection or for Seven Bridges, it is undisputed that McKenzie and/or Seven Bridges purchased art from Defendants until 2011, obtaining more than 100 pieces in total.  (Def. 56.1 St. ¶¶ 22-23; Pl. 56.1 Counterstmt. ¶ 23.)  Each sale was documented with an invoice showing the price of the artwork and any attendant discount.  (Declaration of Robert Fishko in Support of Defendants/Counter-Plaintiffs' Motions for Summary Judgment and Stay of Proceedings ("Fishko Decl."), Ex. 2.)  Plaintiffs agreed to the prices reflected on the invoices (Def. 56.1 ¶¶ 46, 48), but now allege that the invoices were based on fraudulent reference prices.

---

[1]  Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer.  Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

McKenzie alleges that R. Fishko represented to him that R. Fishko could act as Plaintiffs' "agent" or "buyer's representative" and would offer them a twenty percent discount from the "list price"[2] of any works by artists that Defendants represented (Plaintiffs refer to such sales as "primary market" sales).  McKenzie also alleges that R. Fishko represented that Defendants would negotiate with other dealers to get Plaintiffs the "best possible price" on works by artists not represented by Defendants (Plaintiffs refer to such sales as "secondary market" sales), and that Plaintiffs would be charged a five percent commission on those "best possible" prices.  (Pl. 56.1 St. ¶ 16.)  The parties agree that any alleged contract was not made in writing.  (Def. 56.1 St.¶ 26; Pl. 56.1 Counterstmt. ¶ 26.)  Plaintiffs further allege that the Fishkos had "an extremely high degree of specialized knowledge and expertise in the niche area of art Plaintiffs were collecting" and that McKenzie relied upon that knowledge and expertise.  (Pl. 56.1 St. ¶¶ 19-20.)  According to Plaintiffs, the Fishkos befriended McKenzie and his ex-wife in order to gain McKenzie's trust.  (Id. ¶ 27.)

All of Plaintiffs' claims turn on the assertions that Defendants were contractually obligated to make primary market sales to Plaintiffs at a 20% discount from a "list price" and that secondary market transactions were to be priced at Defendants' acquisition price plus a five per cent commission.  (Compl. ¶ 17.)  Plaintiffs allege that Defendants breached their obligations by manipulating or otherwise falsifying the prices to which the discounts were applied, thereby increasing Defendants' profits.  Plaintiffs principally proffer McKenzie's declarations and deposition testimony as proof of existence of the alleged contract.  In his declarations, McKenzie provides no details of any alleged statements made by Defendants, nor of when the contracts were allegedly formed.  McKenzie's contentions regarding the alleged secondary market

---

[2]     The price that each artist asked for his or her work.

agreement are based on his representations of his understanding of what R. Fishko meant when, during unspecified conversations at unspecified times, he undertook to get the Plaintiffs the "best price." (See e.g., Pl. 56.1 St. ¶ 16.) As to the primary market agreement, McKenzie asserts that Defendants did not actually have list prices, but supports this allegation only with deposition testimony in which C. Fishko referred to a database of prices. (Pl. 56.1 St. ¶ 50.)

In support of their motion, and in opposition to Plaintiffs' cross-motion, Defendants proffer transcripts of McKenzie's inconsistent deposition testimony disclaiming any recollection of what he or R. Fishko purportedly said at the time they entered into the alleged primary market agreement, where they were, or whether the alleged oral agreement was reached in person or over the phone. (Def. 56.1 St. ¶ 27.) Defendants also proffer evidence of McKenzie's conflicting accounts – varying by several years – as to when the alleged primary market agreement was formed. (Id. ¶¶ 28-29.) As to the secondary market agreement, Defendants demonstrate that McKenzie has testified both that the agreement existed from the beginning of the parties' relationship in 1997, and that it was not formed until sometime between 2004 and 2006. (Def. 56.1 St. ¶¶ 31-32.) McKenzie has also previously testified that Forum "was to charge [ ] 5 percent on any painting over $300,000" (Def. 56.1 St. ¶ 33), but now contends that the five percent commission applied to all secondary market transactions regardless of price. (See Pl. 56.1 St. ¶ 46; Def. 56.1 St. ¶ 36.) At a deposition in a related action, McKenzie denied that there was a five per cent agreement with respect to a work on which he now contends he paid five per cent on an inflated acquisition price. (Def. 56.1 Counterstmt. ¶ 40.) Defendants further demonstrate that McKenzie has admitted uncertainty as to whether the alleged five per cent agreement was meant to be a discount from the list price or a commission on acquisition cost, that he has acknowledged that the term "cost" was never defined, and that he

is uncertain as to the meaning of the term "best possible price."  (Def. 56.1 St. ¶ 41.)  Finally,

Defendants demonstrate that Plaintiffs have not identified anyone other than McKenzie who

knew about these alleged agreements.  (Def. 56.1 St. ¶¶ 43-45.)

In or about 2011, a principal of a competing gallery allegedly told McKenzie that

a Ralph Goings painting entitled "Tom's Diner" that McKenzie had purchased from a collector

through Forum for $748,125 was actually purchased by Forum for $350,000.  (Def. 56.1 St. ¶

57.)  McKenzie testified that he felt that Forum's alleged profit of $398,125 on the transaction

was excessive and began to suspect fraud.  (Id. ¶ 58.)  Defendants contend that Forum did not

purchase "Tom's Diner" for $350,000, but rather for $650,000.  (Id. ¶¶ 59-60.)  According to

Plaintiffs, Forum made a profit of 114 percent in connection with the "Tom's Diner" transaction,

while Defendants contend that Forum made a profit of 13.1 percent.  (See Declaration of Ryan

Weiner in Support of Defendants/Counter-Plaintiffs' Motions for Summary Judgment and Stay

of Proceedings, Ex. 7; Def. 56.1 St. ¶¶ 61-62.)  Plaintiffs proffer no affidavit or other evidence of

the alleged $350,000 purchase price.

Plaintiffs also allege that, around this time, R. Fishko located a painting by

Norman Rockwell entitled "Billiards is Easy to Learn," which was listed at $1,400,000, but R.

Fishko told McKenzie that he had secured a deal for McKenzie to purchase it for $1,225,000.

Plaintiffs allege that, when the gallery sold the painting to R. Fishko for $1,025,000, Fishko

improperly retained the $200,000 difference instead of the allegedly agreed upon five percent

commission.  (Pl. 56.1 St. ¶¶ 34-39.)  Defendants acknowledge the difference was $200,000, but

deny that there was any cost-plus-five percent agreement with Plaintiffs.  (Def. 56.1

Counterstmt. ¶ 39.)  Plaintiffs proffer evidence of disparities between the secondary market

purchase prices from Defendants' gallery on which their invoices and discounts were based and

Defendants' acquisition costs for the purchased works.  (Id. ¶ 47.)

In or around February 2011, Forum delivered a painting called "Imperial" by Davis Cone to McKenzie's home for McKenzie to consider for purchase.  (Def. 56.1 St. ¶ 63.) However, Defendants contend that, upon hearing about the alleged markup of "Tom's Diner," McKenzie refused to pay for or return "Imperial," instead demanding "restitution" and warning R. Fishko, "neither of us wants the publicity related to a court scene" or potential legal fees. (Def. 56.1 St. ¶¶ 64-67.)  Defendants contend that they agreed to settle the dispute to avoid the litigation costs and adverse publicity and to recover "Imperial."  (Id. ¶ 68.)  According to Defendants, the parties reached a settlement agreement on March 9, 2011, which required Forum to wire Plaintiffs $250,000 in return for a general release, but Plaintiffs dispute that such an agreement was reached.  (Def. 56.1 St. ¶ 69; Pl. 56.1 Counterstmt. ¶ 69.)  Defendants allege that McKenzie confirmed the final terms of the settlement agreement and release by emailing back, "OK LETS GO FORWARD," and that Forum then wired McKenzie the $250,000 settlement payment, but McKenzie refused to return "Imperial."  (Def. 56.1 St. ¶¶ 74-76.)  Forum sued McKenzie in Connecticut superior court on March 24, 2011, to recover "Imperial."  (Id. ¶ 77.)

According to Plaintiffs, McKenzie refused to sign the "Long Form General Release" that Defendants sent because the figures were incorrect and, further, he had told Defendants five days prior to the "OK LETS GO FORWARD," email, "please be aware there is no agreement."  (Pl. 56.1 St. ¶¶ 57-58.)  Plaintiffs also contend that McKenzie withheld "Imperial" as "self help" or a "set off."  (Pl. 56.1 Counterstmt. ¶ 76.)  On or about April 5, 2011, the Connecticut Superior Court ordered McKenzie to return "Imperial" to Forum and on July 11, 2011, the court granted Forum summary judgment on its replevin claim, but McKenzie never returned the $250,000 settlement payment.  (Def. 56.1 St. ¶¶ 78-81.)  According to Plaintiffs, a

general release was never contemplated.  (Pl. 56.1 Counterstmt. ¶ 71.)

Defendants allege that, in January 2012, Forum received a letter from a Louisiana lawyer on behalf of McKenzie threatening to sue Forum in Louisiana if it did not turn over its business records to McKenzie.  (Def. 56.1 St. ¶ 85.)  Forum then filed a declaratory judgment action in Connecticut Superior Court on or about January 23, 2012 (separate from the replevin action) to enforce what Defendants claim was the general release in the earlier settlement agreement.  (Id. ¶ 86.)  On or about September 28, 2012, while the Connecticut case was pending, McKenzie filed the instant action and shortly thereafter filed a motion to stay the Connecticut action on the ground that "[t]he General Release should be asserted as an Affirmative Defense in the Southern District Action."  (Id. ¶ 87.)  In January 2013, the Connecticut Superior Court denied Forum's motion for summary judgment in its action for enforcement of the alleged release, finding that the evidence was ambiguous.  (Declaration of Richard McKenzie in Opposition to Defendants' Motions for Summary Judgment and to Stay and in Support of Plaintiffs' Cross-Motion for Summary Judgment ("McKenzie Decl."), Ex. 3.)  On March 11, 2013, the Connecticut Superior Court granted McKenzie's motion to stay the declaratory judgment in favor of the instant litigation.  (Def. 56.1 St. ¶ 88.)


DISCUSSION

Summary judgment shall be granted in favor of the movant where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Holtz v. Rockefeller &

Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted).  The

moving party bears the burden of demonstrating the absence of a material fact dispute, Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986), and the court must be able to find that,

"'after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact

could find in favor of that party.'"  Marvel Entertainment, Inc. v. Kellytoy (USA), Inc., 769 F.

Supp. 2d 520, 523 (S.D.N.Y. 2011) (quoting Heublein v. United States, 996 F.2d 1455, 1461 (2d

Cir. 1993)).  The nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts" and "cannot rely on conclusory allegations or

unsubstantiated speculation."  Barounis v. New York City Police Dept., No. 10CV2631-SAS,

2012 WL 6194190, at *5 (S.D.N.Y. Dec. 12, 2012) (internal quotation marks and citations

omitted).

   Summary judgment is also appropriate where the moving party can demonstrate

that the nonmoving party bears the burden of proof with regard to its claims, but has not

sustained that burden.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) ("the burden on

the moving party may be discharged by 'showing' – that is, pointing out to the district court –

that there is an absence of evidence to support the nonmoving party's case.").  Furthermore, "a

party does not show a triable issue of fact merely by submitting an affidavit that disputes his own

prior sworn testimony," Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996), nor can "[a]

party opposing summary judgment . . . show the existence of a genuine issue of fact to be tried

merely by making assertions that are conclusory."  Major League Baseball Properties, Inc. v.

Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008).

   The same legal standards apply when analyzing cross-motions for summary

judgment.  See Schultz v. Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004).  "[E]ach party's

motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).


Whether the March 9, 2011, Release Bars Plaintiffs' Claims

Defendants contend that, under the parties' alleged settlement agreement in connection with "Imperial," McKenzie agreed to a general release of all claims against Forum that bars Plaintiffs' claims here. Defendants seek summary judgment dismissing this action as violative of the settlement agreement, and further seek an award of litigation costs as damages in respect of their counterclaims. Plaintiffs assert that such relief is precluded by the Connecticut Superior Court's denial of Defendant's summary judgment motion in its declaratory judgment action based on the alleged settlement agreement. In New York, settlement agreements must be construed "according to general principles of contract law." Brodeur v. City of New York, No. 04CV1859-JG, 2005 WL 1139908, at *3 (E.D.N.Y. 2005) (citing Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002)). "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) (internal quotation marks and citations omitted).

Defendants' contention that Plaintiffs agreed to release their claims is premised on a series of email exchanges that took place in March 2011 between McKenzie and Deborah Lans, Esq., an attorney for Defendants. Plaintiffs assert that Defendants are collaterally estopped from raising the release issue here because the Connecticut state court denied Defendants' summary judgment motion based on the same agreement, and characterized a message including "general release" language as "an ambiguous attempt to release." (See Pl.

56.1 St. ¶ 52; McKenzie Decl., Ex. 3 at 7:12-14, 17:11-12).  In reaching this conclusion, the Connecticut court cited the parties' disparate interpretations of the language used in their communications and the nature of their interactions as factual disputes.  The court did not specifically reject Forum's contention that a release existed.  Rather, it noted that the facts were susceptible of interpretations favorable to both sides.  (See McKenzie Decl., Ex. 3 at 15:24 - 16:3.)  Thus, on its face, the summary judgment decision did not purport to resolve the question of whether there was an effective release, and does not preclude further litigation of the issue.

      Even if Plaintiffs are correct in contending that the Connecticut decision rejected Defendants' settlement argument on the merits, the question of preclusion "is decided under Connecticut law because the federal courts give to a state-court judgment the same preclusive effect that it would have in the courts of the rendering state."  Roll-A-Cover v. Cohen, No. 09CV1378-CSH, 2012 WL 6568463, at *4 (D. Conn. Dec. 17, 2012).  "[U]nless the unsuccessful party in the prior litigation had the opportunity to seek appellate review, th[e] issue has not been fully litigated for the purposes of collateral estoppel."  Weiss v. Weiss, 297 Conn. 446 at n. 20 (2010).  "Under Connecticut law, [t]he denial of a motion for summary judgment ordinarily is an interlocutory ruling and, accordingly, not a final judgment for purposes of appeal."  See Harnage v. Commissioner of Correction, 141 Conn. App. 9, 13 (Conn. App. 2013) (alteration in original) (internal quotation marks and citation omitted).  Here, shortly after the motion for summary judgment was denied, the Connecticut action was stayed.  (See Def. 56.1 St. ¶ 88, Fishko Decl., Exs. 15 and 16.)  Because the Connecticut action was stayed without allowing for further appellate review of the issue of the alleged release, the Court finds that Defendants are not barred by collateral estoppel from raising it here.

      As to the question of whether the March 2011, emails are enforceable as a general

release barring all of Plaintiffs' claims, Plaintiffs argue that the emails are ambiguous and therefore questions of fact exist as to whether McKenzie accepted or intended to be bound by such a release, and precisely what claims such a release might have covered.  See Muldoon v. Homestead Insulation Co., 231 Conn. 469, 482 (1994) ("a release, no matter how broad its terms, will not be construed to include claims not within the contemplation of the parties . . . and, where the language of the release is directed to claims then in existence, it will not be extended to cover claims that may arise in the future") (internal quotation marks and citation omitted). Four days before the email exchange cited by Defendants, their attorney sent a document to McKenzie, entitled "Covenant Not To Sue and Release," which contained explicit terms regarding a release.  McKenzie responded to that email with the statement: "please be aware there is no agreement–mr. Fishko confused agreement with writing it up and the figures are incorrect–may I have my lawyers contact you as we go forward . . ."  (McKenzie Decl., Ex. 38.) Plaintiffs also proffer that C. Fishko testified that the $250,000 wired to McKenzie was in exchange for the return of the Cone painting "Imperial," while McKenzie testified that it was reimbursement for the Goings painting and that it was never intended to be part of a general release.  (See also McKenzie Decl. ¶ 56 ("Plaintiffs in no way, shape or form agreed to give Forum or Fishko a 'General Release' (or limited release) of any claims in any manner").) Drawing all inferences in the light most favorable to the nonmoving Plaintiffs, the Court finds that there is a genuine dispute of material fact as to whether the parties intended to be mutually bound by a general release and any attendant terms.[3]  Accordingly, the Court denies Defendants'

---

[3]       Plaintiffs argue that Defendants' Counterclaims, which are all based on the alleged general release, should be dismissed.  (See Pl. Mem in Opp. at 11.)  Because a genuine dispute of material fact exists as to the scope and meaning of the exchange concerning the alleged release, Plaintiff's request for dismissal of these counterclaims is denied.

motion for summary judgment seeking dismissal of Plaintiffs' claims as barred by a general

release, and further denies the motion to the extent it seeks judgment in Defendants' favor on

their counterclaims.


Plaintiffs' Breach of Contract Claim[4]

Defendants and Plaintiffs each move for summary judgment on Plaintiffs' breach

of contract claim.  To prevail on a claim for breach of contract, a plaintiff must establish: (1) the

existence of an agreement; (2) adequate performance by the plaintiff; (3) breach by the

defendant; and (4) damages resulting from the breach.  See Ellington Credit Fund, Ltd. v. Select

Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188 (S.D.N.Y. 2011).  Plaintiffs bear the burden

of proof as to all elements of their breach of contract claim.  See, e.g., Kaul v. Hanover Direct,

Inc., 296 F. Supp. 2d 506, 523 ("[a] party asserting breach of contract claim has [the] burden of

proof to establish all elements of its cause of action") (internal quotation marks and citation

omitted).  Here, the evidence proffered is insufficient to carry that burden, even when viewed in

the light most favorable to Plaintiffs.

Defendants first argue that Plaintiffs' breach of contract claim must fail because

the purported primary and secondary market agreements are void for vagueness.  "The terms of

an alleged contract must be set forth with enough clarity to enable the court to discern the

---

[4]     Although the purported agreements do not include a choice of law clause, both parties
assume that New York law governs.  In a diversity action such as this, the choice of
law rules of the forum state apply.  See Klaxon Co. v. Stentr Elec. Mfg. Co., 313 U.S.
487, 496-97 (1941).  "Under New York law, 'in the absence of a strong countervailing
public policy, the parties to litigation may consent by their conduct to the law to be
applied.'"  Mentor Ins. Co. v. Brannkasse, 996 F.2d 506, 513 (2d Cir. 1993) (internal
citation omitted).  Here, because the parties have relied on New York law and no
countervailing policy cautions against the application of New York law, the Court will
apply New York law.

parties' agreement with reasonable certainty. . . [D]efiniteness as to material matters is the very

essence of contract law."  See Bice v. Robb, No. 07CV2214-PAC, 2012 WL 762168, at *5

(S.D.N.Y. Mar. 9, 2012), aff'd, 511 Fed. App'x 108 (2d Cir. 2013) (internal quotation marks and

citation omitted).  Plaintiffs do not deny that they agreed to pay the prices, and accept the

discounts reflected, on the invoices issued with various transactions.  As noted above, the crux of

Plaintiffs' claims is the contention that Defendants had agreed to base primary market pricing on

"list prices" that differed in some unspecified way from the prices on which the transactions

were actually concluded, and that Defendants were contractually obligated to base secondary

market sales prices on the actual acquisition costs of the works.  Plaintiffs proffer no evidence,

however, of specific commitments in this regard.  McKenzie's declarations, upon which

Plaintiffs rely, make generalized assertions about alleged agreements and actions taken in

contravention of them.  McKenzie disclaimed any more specific knowledge in his depositions,

and previously gave testimony inconsistent with his current assertions regarding the terms of the

secondary market agreement.   No rational finder of fact could determine the material terms of

the alleged contracts, and whether they had been breached by Defendants, from McKenzie's

constantly-shifting conclusory proffers.  Nor is there even a non-conclusory basis in Plaintiffs'

factual proffers for a determination that Defendants made any agreement with Plaintiffs as to the

determination of reference prices, commissions, or any matters other than the terms reflected in

the invoices for particular transactions.

        Where, as here, "the terms of the agreement are so vague and indefinite that there

is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion

a remedy, and no means by which such terms may be made certain, then there is no enforceable

contract."  Rogen v. Scheer, No. 86CV2058-MJL, 1991 WL 33294, at *5 (S.D.N.Y. Feb. 22,

1991) (internal quotation marks and citation omitted).  Accordingly, the Court finds that Plaintiffs have failed to proffer evidence sufficient to sustain the burden of proof on their breach of contract claim, and therefore grants Defendants' motion for summary judgment dismissing that cause of action.  Plaintiffs' cross-motion for summary judgment is also denied.  In light of the foregoing determination, the Court need not address Defendants' parol evidence and statute of frauds arguments.

Plaintiffs' Fraud Claim

Defendants argue that Plaintiffs' fraud claim fails as a matter of law, while Plaintiffs cross-move for summary judgment, contending that they have established that Defendants committed fraud.  To establish fraud, a plaintiff must show, by "clear and convincing evidence [that]: (1) [there was] a material misrepresentation or fact; (2) made by defendant with knowledge of its falsity; (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."  Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006).  According to Plaintiffs, Defendants fraudulently marked up their costs, sometimes in excess of one hundred percent, before tacking on a five percent commission.  (See Compl. ¶ 17, Pl. Mem. in Opp. at 4-5.)  Plaintiffs refer specifically to the sales of the Norman Rockwell painting, "Billiards is Easy to Learn" and the Ralph Going painting "Tom's Diner," contending that R. Fishko fraudulently inflated the prices of the paintings so as to earn a greater commission.  (Pl. Mem. in Opp. at 5-6.)

Defendants contend that McKenzie's fraud claim must be dismissed because it is duplicative of his breach of contract claim.  A plaintiff may not maintain a fraud claim that is premised on, or duplicative of, a breach of contract claim.  See Bridgestone/Firestone Inc. v.

Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (in order for a fraud claim to survive, it must "(i) demonstrate a legal duty separate from the duty to perform under the contract, . . . or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, . . . or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.") (internal quotation marks and citations omitted).  Fraud claims must be dismissed as duplicative where "the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract."  LBBW Luxemburg S.A. v. Wells Fargo Securities LLC, 10 F. Supp. 3d 504, 521 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).  To the extent that Plaintiffs generally argue that Defendants committed fraud by making material misrepresentations of fact and omitting material information instead of complying with the alleged primary and secondary market agreements, the fraud claim is duplicative of the breach of contract claim.  The Complaint itself contains nearly identical allegations.  (Compare Compl. ¶ 17 (fraud claim) with Compl. ¶ 31 (breach of contract claim).)

As to the two specific transactions in which McKenzie alleges that R. Fishko misrepresented the prices at which the sellers were willing to deal, Plaintiffs' evidentiary proffers fall far short of the clear and convincing showing required to demonstrate fraud. Plaintiff proffers only his own conclusory assertions as to the true prices of the works and R. Fishko's alleged false statements.  Furthermore, with respect to the Rockwell Painting, Plaintiffs' current assertion that the transaction was meant to be based on the alleged cost-plus-five percent formula is inconsistent with McKenzie's earlier sworn denial of any such agreement regarding that painting.  (Pl. 56.1 St. ¶ 35; Def. 56.1 Counterstmt. ¶ 35)  Plaintiffs' generalized assertions that Defendants are untrustworthy, and proffers of alleged misrepresentations by Defendants regarding the pricing of another artist's work in proceedings in another court, are

insufficient to frame a genuine dispute of material fact as to whether Defendants defrauded

Plaintiffs in connection with any transactions.

Accordingly, Defendants' motion for summary judgment is granted with respect

to Plaintiffs' fraud claim, and Plaintiffs' cross-motion is denied as to that claim.


Plaintiffs' Breach of Fiduciary Duty Claim

Plaintiffs have also asserted a claim for breach of fiduciary duty.  Defendants

move for summary judgment dismissing this claim and Plaintiffs cross-move for summary

judgment in their favor.  To prevail on a breach of fiduciary duty claim, a plaintiff must establish

"(1) the existence of a fiduciary duty between the parties; (2) a breach of that duty; (3) the

defendant's knowing participation in that breach; and (4) damages resulting from that breach."

See Grund v. Del Charter Guar. & Trust.Co., 788 F. Supp. 2d 226, 248 (S.D.N.Y. 2011).  "A

fiduciary relationship exists . . . when one [person] is under a duty to act for or to give advice for

the benefit of another upon matters within the scope of the relation."  Ritani, LLC v. Aghjayan,

No. 11CV8928, 2013 WL 4856160, at * 19 (S.D.N.Y. Sept. 9, 2013) (internal quotation marks

and citations omitted).  "A fiduciary relationship does not exist between parties engaged in an

arm's length business transaction."  Manta Industries Ltd. v. Law, No. 12CV5094-MGC, 2013

WL 2181729, at *1 (S.D.N.Y. May 17, 2013) (internal quotation marks and citation omitted).

Defendants first argue that Plaintiffs' breach of fiduciary duty claim is duplicative

of their breach of contract claim.  See Cal Distrib. Inc. v. Cadbury Schweppes Am. Beverages,

Inc., No. 06CV0496-RMB-JCF, 2007 WL 54534, at *9 (S.D.N.Y. Jan.5, 2007) ("[a] cause of

action for breach of fiduciary duty which is merely duplicative of a breach of contract claim

cannot stand") (internal quotation marks and citation omitted); see also Barbara v. MarineMax,

Inc., No. 12CV0368-ARR, 2012 WL 6025604, at *9 (E.D.N.Y. Dec. 4, 2012) ("[i]f the breach of

fiduciary duty claim indeed arises from the duties imposed by the [contract], the claim is

duplicative of the breach of contract claim") (internal quotation marks and citation omitted).

Here, Plaintiffs' breach of fiduciary duty claim arises from the same facts and purported duties

imposed by the primary and secondary market agreements as Plaintiffs' breach of contract claim,

making the claims largely duplicative. (Compare Compl. ¶ 37 (breach of fiduciary claim) with

Compl. ¶ 31 (breach of contract claim).)

Even if Plaintiffs' fiduciary duty claim is not entirely duplicative of their breach

of contract claim, Plaintiffs have not proffered sufficient evidence to carry their burden of

demonstrating that Defendants owed them fiduciary obligations.  "[A]llegations of superior

knowledge or expertise in the art field are per se insufficient to establish the existence of a

fiduciary relationship."  Arthur Properties S.A. v. ABA Gallery, Inc., No. 11CV4409-LAK, 2011

WL 5910192 (S.D.N.Y. Nov. 28, 2011) (internal quotation marks and citation omitted).

Moreover, "when parties deal at arms length in a commercial transaction, no relation of

confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent

extraordinary circumstances."  Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511

(S.D.N.Y. 1994) (internal quotation marks and citation omitted).  Even a "longstanding

relationship of fifty years" is insufficient to establish a fiduciary relationship "where parties deal

at arms length in a commercial transaction."  See Compania Sud-Americana de Vsapores, S.A.

v. IBJ Schroder Bank & Trust Co., 785 F. Supp. 411, 425-26 (S.D.N.Y. 1992).  McKenzie

testified to negotiating prices with Forum, and could only identify the Rockwell and Going

paintings as works that were not sold pursuant to an arms' length transaction.  (See Weiner

Decl., Ex. 2, McKenzie Dep. at 285:24-286:16, 290:25-293:15.)  In light of McKenzie's own

allegations that those transactions were priced according to negotiated formulae, the record is devoid of any evidence demonstrating the existence of a fiduciary relationship.  Accordingly, Defendants' motion for summary judgment is granted, and Plaintiffs' cross-motion is denied, as to this claim.

Claim for an Accounting

Plaintiffs also assert a claim for an accounting of the prices that Defendants paid in the secondary market for art sold to McKenzie.  To establish an accounting claim, a plaintiff must show: "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal."  Aero Media LLC v. World Healing Center Church, No. 12CV5196-LLS, 2013 WL 2896856, at *6 (S.D.N.Y. June 11, 2013) (internal quotation marks and citation omitted).  "In order to sustain an equitable action for accounting under New York law, a plaintiff must show either a fiduciary or confidential relationship with the defendant," Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 49 (2d Cir. 1996), "which induced plaintiff to entrust defendant with property or money and [that] no legal remedy exists."  Beck v. CIT Group/Credit Fin., Inc., No. 95CV5800-MGC, 1998 WL 655547, at *3 (S.D.N.Y. Sept. 24, 1998).  Plaintiffs have not produced any evidence suggesting that they entrusted Defendants with property or money other than money paid for artwork of which they took possession.  Moreover, because Plaintiffs have sought damages in connection with their breach of contract claim, an adequate legal remedy exists.  Accordingly, Defendants' motion for summary judgment on this claim is granted and Plaintiffs' cross-motion for summary judgment is denied.

Constructive Trust

Plaintiffs also ask the Court to impose a constructive trust on the $3,540,000 that they seek in monetary damages in connection with the breach of contract claim.  (See Compl. ¶¶ 45-49.)  A party claiming entitlement to a constructive trust must ordinarily establish: "(1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment."  Ely v. Perthius, No. 12CV1078-DAB, 2013 WL 411348, at *8 (S.D.N.Y. Jan. 29, 2013) (internal quotation marks and citations omitted).  The Court has already found that there is no evidence that a fiduciary relationship existed between the parties.  There is also no evidence that Defendants were unjustly enriched or that a promise was made by Defendants outside the purported primary and secondary market sales agreements.  Plaintiffs' claims relate to these agreements and the sale of artwork of which Plaintiffs concede they took possession.  Accordingly, the Court grants Defendants' motion for summary judgment seeking to dismiss this claim and denies Plaintiffs' cross-motion for summary judgment.

New York General Business Law § 349

Plaintiffs also claim that Defendants violated New York General Business Law § 349  by deceiving the public through the sale of fraudulently priced artwork.  This statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  N.Y. Gen. Bus. Law § 349.  The elements of a cause of action under this section are: "(1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act."  Exxonmobil Inter-America, Inc. v. Advanced Information Engineering Services, Inc., 328 F. Supp. 2d 443, 447 (S.D.N.Y. 2004).  To bring a claim under this section, however, there must be a "consumer

injury or harm to the public interest." <u>Securitron Magnalock Corp v. Schnabolk</u>, 65 F.3d 256, 264 (2d Cir. 1995) (internal quotation marks and citation omitted). "The critical question, then, is whether the matter affects the public interest in New York." <u>Id.</u> Private transactions between two parties do not give rise to liability under this statute. <u>See</u> <u>Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank N.A.</u>, 85 N.Y.2d 20, 25 (1995) ("Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute."). Here, the entire complaint is based on the purported existence of private agreements between McKenzie and Forum and in no way involves the consuming public. The Court therefore grants Defendants' motion for summary judgment seeking dismissal of this claim and denies Plaintiffs' cross-motion.

<u>Punitive Damages</u>

Plaintiffs include a separate claim for punitive damages in the Complaint. (<u>See</u> Compl. ¶¶ 50-55.) However, no free-standing claim for punitive damages exists under New York law. <u>See</u> <u>T.P. ex rel. Patterson v. Elmsford Union Free School Dist.</u>, No. 11 CV 5133(VB), 2012 WL 860367, at *12 (S.D.N.Y. Feb. 27, 2012). Accordingly, in light of the dismissal of all of Plaintiffs' other claims, the Court grants Defendants' motion for summary judgment dismissing the punitive damages claim.

C<small>ONCLUSION</small>

For the foregoing reasons, Defendants' motion for summary judgment is granted as to each of the claims asserted by Plaintiffs in this action. Defendants' motion is denied as to each of their counterclaims. Plaintiffs' cross-motion for summary judgment is denied in its

entirety.  The stay of this litigation is hereby lifted.

This Memorandum Order resolves docket entry numbers 98 and 115.

The parties are directed to contact Magistrate Judge Fox's Chambers promptly to schedule a settlement conference with respect to the counterclaims.  The final pretrial conference in this matter is hereby scheduled for **Friday, May 8, 2015, at 11:00 a.m.**, in Courtroom 12D. Unless the remaining claims are settled, the parties must confer and make submissions in advance of the conference in accordance with the pre-trial scheduling order.  (Docket Entry No. 31.)

SO ORDERED.


Dated: New York, New York
       February 13, 2015


  /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge